# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 11-2708

_____

| | | |
|---|---|---|
| Joan Lorraine Burke, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Missouri. |
| Curtis Sullivan, in his individual | * | |
| capacity; Robert Bell, in his individual | * | |
| capacity; Andrea Nack, Deputy, in her | * | |
| individual capacity, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: March 15, 2012
Filed: May 3, 2012

_____

Before RILEY, Chief Judge, SMITH and SHEPHERD, Circuit Judges.

_____

RILEY, Chief Judge.

Joan Burke brought this action under 42 U.S.C. § 1983 against Deputy Curtis Sullivan, Deputy Andrea Nack, and Corporal Robert Bell (collectively, officers) of the St. Charles County (Missouri) Sheriff's Department, claiming the officers unlawfully entered her home and detained her in violation of the Fourth and Fourteenth

Amendments. The district court[1] granted summary judgment in favor of the officers, concluding the officers did not violate Burke's constitutional rights and were therefore entitled to qualified immunity. Burke appeals, and we affirm.

## I.    BACKGROUND[2]

Burke lives with her son, Jeffrey Burke (Jay), in Dardenne Prairie, Missouri. On June 27, 2009, Jay attended a party at a neighbor's house where he became intoxicated. When the hosts of the party asked Jay to leave, Jay refused. Later in the evening, a partygoer made a comment about Jay while Jay was lying on a couch. Jay jumped off the couch, ripped off his shirt, and started screaming and threatening to "beat[] everybody up." Several people tried to restrain Jay, but he continued to yell, curse, and threaten to fight people. Jay also threw a liquor bottle and another object across the room.

Sometime later, Burke awoke and heard voices and noise coming from outside her home. Burke also heard someone call her son's name. Burke went outside to investigate. Approaching one of the hosts of the party, Burke asked what was happening. The host told Burke about the problems with Jay, and Burke agreed to talk to Jay. Burke asked her son to leave. Jay refused. Burke then grabbed Jay by the left arm and told him to leave. Jay twisted away from Burke and broke her hold on his arm, causing Burke to fall and hit her head on a wall. Burke returned home without Jay.

---

[1]The Honorable Catherine D. Perry, Chief Judge, United States District Court for the Eastern District of Missouri.

[2]Our recitation of the facts is based on the facts set forth in the Defendants' Statement of Uncontroverted Material Facts in Support of Defendants' Motion for Summary Judgment, which Burke admitted were true for the purposes of the motion.

After Burke left, a guest named Jamey LaRose approached Jay, wrapped his arms around Jay, and tried to drag him outside. A struggle ensued. During the struggle Jay bit LaRose on the wrist between two and four times. Each bite was forceful enough to draw blood. During the struggle, Jay kicked or punched a table, which broke. The party guests then forced Jay out of the house. Jay ran across the street and went into Burke's residence.

At 12:42 a.m., in response to a call reporting a domestic disturbance, Deputies Sullivan and Nack and Corporal Bell arrived at the party. During their initial investigation, Deputies Sullivan and Nack learned Jay: had become highly intoxicated; was asked to leave the party; would not listen to Burke when she tried to get him to go home and was verbally abusive to Burke; forcefully pushed Burke against a wall; got into a physical altercation with one of the guests; kicked and broke a table; was known to use illegal drugs and may have been under the influence of illegal drugs; and went into Burke's house across the street immediately before the officers arrived. Deputies Sullivan and Nack observed LaRose's bleeding bite wounds.

The officers went to Burke's residence, knocked loudly on the front door, but heard no response. Deputy Sullivan requested that the officers' dispatch operator contact Burke's residence by telephone. The dispatch operator responded there was no answer.[3] At the same time, Corporal Bell and Deputy Nack entered Burke's backyard through a gate in the fence. Corporal Bell approached the rear door of the residence and shined his flashlight through the windows on the first and second floors

---

[3]The parties agree a thunderstorm had knocked out the power to Burke's neighborhood. There are conflicting accounts as to whether the telephone in Burke's home actually rang, but Burke admitted "[d]ispatch advised Deputy Sullivan over the radio that there was no answer."

of the residence. Corporal Bell also attempted to gain the attention of anyone inside by shouting. Although there was no response, Corporal Bell could hear a dog barking. Burke, inside the house, heard voices in her backyard, but paid no attention to them.

The officers then entered Burke's residence through the rear door. The officers announced their presence and Burke responded. The officers told Burke to put down any weapons and come down the stairs with her hands up. Burke responded, "I don't have any weapons, but I have a 100 pound dog that I'm struggling to hold onto." Corporal Bell told Burke if she let go of the dog he would shoot it. Burke then secured the dog and went downstairs. Burke and the officers engaged in a verbal exchange,[4] and the officers left. Fewer than two minutes elapsed from the time Burke first responded to the officers to the time the officers left her residence.

On April 7, 2010, Burke filed a § 1983 claim, alleging the officers conducted an unreasonable search and seizure in violation of her Fourth Amendment rights by entering her home without a warrant and briefly detaining her. In February 2011, Burke moved for summary judgment on liability, and the officers moved for summary judgment on the basis of qualified immunity. On July 27, 2011, the district court denied Burke's motion and granted the officers' motion for summary judgment, concluding the officers' warrantless entry into Burke's home was constitutional under either the emergency aid exception or the community caretaker exception to the warrant requirement. Burke now appeals the district court's grant of summary judgment.

## II.    DISCUSSION

We review a district court's decision to grant summary judgment on the basis of qualified immunity de novo, Borgman v. Kedley, 646 F.3d 518, 522 (8th Cir. 2011), and will affirm if, viewing the record in the light most favorable to the non-moving

---

[4]The content of this conversation is disputed, but is immaterial to our analysis.

-4-

party, there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, Morrison Enters., LLC v. Dravo Corp., 638 F.3d 594, 602 (8th Cir. 2011).  See also Fed. R. Civ. P. 56(a) (amended in 2010).

Under the qualified immunity doctrine, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Officials are not liable for incorrect decisions made in "gray areas" of the law.  Ambrose v. Young, 474 F.3d 1070, 1077 (8th Cir. 2007).

To defeat "a defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation."  Howard v. Kansas City Police Dep't., 570 F.3d 984, 988 (8th Cir. 2009); see also Smook v. Minnehaha Cnty., 457 F.3d 806, 813 (8th Cir. 2006) ("To defeat a claim of qualified immunity, the contours of an alleged constitutional right must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987))).  We may examine the two steps of a qualified immunity analysis in any order.  See Pearson v. Callahan, 555 U.S. ___, ___, 129 S. Ct. 808, 818 (2009).  At step one, we do not detect any constitutional or statutory right deprivation in this case.

Generally, "'[s]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'"  United States v. Claude X, 648 F.3d 599, 602 (8th Cir. 2011) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  The district court found two such exceptions applicable here: the emergency aid exception and the community caretaker exception.

-5-

The emergency aid and community caretaker exceptions are similar in nature, but not identical.[5] Under the emergency aid exception, law enforcement "officers may enter a residence without a warrant when they have 'an objectively reasonable basis for believing that an occupant is . . . imminently threatened with [serious injury].'" Ryburn v. Huff, 565 U.S. ___, ___, 132 S. Ct. 987, 990 (2012) (quoting Brigham City v. Stuart, 547 U.S. 398, 400 (2006)). This is because "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." Brigham City, 547 U.S. at 403 (quoting Mincey v. Arizona, 437 U.S. 385, 392 (1978) (internal quotation marks omitted)); see also Georgia v. Randolph, 547 U.S. 103, 118 (2006) ("[I]t would be silly to suggest that the police would commit a tort by entering [a residence] . . . to determine whether violence (or threat of violence) is about to (or soon will) occur."). Under the community caretaker exception, "[a] police officer may enter a residence without a warrant . . . [when] the officer has a reasonable belief that an emergency exists requiring his or her attention." United States v. Quezada, 448 F.3d 1005, 1007 (8th Cir. 2006) (citing Mincey, 437 U.S. at 392-93). "The Supreme Court has held that reasonable belief . . . is a less exacting standard than probable cause." Id.

The district court found "the officers were justified in entering Burke's home and briefly detaining her." Because the instant matter concerns a claim of qualified immunity, not a motion to suppress evidence, we need not reach the issue of whether the officers violated the dictates of the Fourth Amendment. "The relevant question . . . is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the officers'] warrantless [entry] to be lawful, in light of clearly

---

[5]Because we hold the officers reasonably could have believed both exceptions applied, it is unnecessary to delineate the historical and analytical differences between these two exceptions; however, for a full discussion of the differences between these two exceptions see 3 Wayne R. LaFave, Search and Seizure §§6.5(d), 6.6(a) (4th ed. 2004).

established law and the information the . . . officers possessed." Anderson, 483 U.S. at 641.

Based on the several facts known to the officers, it was reasonable for them to conclude their warrantless entry into Burke's home was lawful under either the emergency aid exception or the community caretaker exception. Jay had become highly intoxicated. Jay refused to leave the neighbor's party. Jay would not cooperate with Burke when she tried to take him home and was verbally abusive to Burke. Jay forcefully pushed Burke against a wall. Jay was involved in a physical altercation with one of the party guests, seriously biting him. Jay kicked and broke a table. Jay was known to use illegal drugs and may have been under the influence of illegal drugs. Jay went into Burke's house across the street immediately before the officers' arrival. There was no response when the officers attempted to contact Burke by knocking on her door, shouting, shining a flashlight inside, and telephoning the residence. Burke, who had been thrown against a wall by Jay, was now in the home alone with a violent suspect. When viewed collectively, these facts could lead a reasonable police officer to conclude there was either a threat of violence or an emergency requiring attention. See Ryburn, 565 U.S. at ___, 132 S. Ct. at 990-91 ("[I]t is a matter of common sense that a combination of events each of which is mundane when viewed in isolation may paint an alarming picture.").

Contrary to Burke's assertion, Smith v. Kansas City, Mo. Police Department, 586 F.3d 576 (8th Cir. 2009) does not dictate a different result. In Smith, we determined a police officer was not entitled to qualified immunity when the officer entered the home of an unarmed domestic violence suspect without a warrant. Id. at 580-81. In reaching our decision, we gave significant weight to the fact the officer had no information any victim or potential victim was inside the home. See id. ("The presence of a domestic violence suspect . . . does not alone justify [the officer's] warrantless entry."). In Burke's case, the officers had specific information a potential victim, Burke, was inside the home with Jay, the violent suspect, whose erratic

-7-

behavior generated the domestic disturbance call. Jay had already been involved in violent encounters with Burke and LaRose. Given these facts, it was reasonable for the officers to conclude their warrantless entry into Burke's home was lawful. See Winters v. Adams, 254 F.3d 758, 763 (8th Cir. 2001) ("[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir. 1993))).

In addition, our court did not decide Smith until November 2009, over four months after the officers entered Burke's home. As such, Smith was not part of the established law when the officers entered Burke's home.

Lastly, as Burke conceded at oral argument, if the officers' entry into Burke's home was lawful, the officers' brief detention of Burke—less than two minutes—was lawful. See United States v. Spotted Elk, 548 F.3d 641, 651 (8th Cir. 2008) ("When police have lawfully entered the house in response to exigent circumstances, they may conduct a protective sweep, or cursory inspection."); Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006) (recognizing community caretaker "functions include seizing a citizen 'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity'" (quoting Winters, 254 F.3d at 763)).

## III.    CONCLUSION
We affirm the well-reasoned opinion and the judgment of the district court.

_____