# United States Court of Appeals

### For the Eighth Circuit

_____

No. 19-1497
_____

United States of America

*Plaintiff - Appellee*

v.

Kenneth Lamont Sanders

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: July 6, 2021
Filed: July 16, 2021

_____

Before ERICKSON, GRASZ, and KOBES, Circuit Judges.

_____

ERICKSON, Circuit Judge.

This case is on remand from the United States Supreme Court. See Sanders v. United States, 593 U.S. ___, 141 S.Ct. 1646 (2021). Kenneth Lamont Sanders entered a conditional guilty plea to possession of a firearm by a prohibited person, in violation of 18 U.S.C. §§ 922(g)(1) and (9), and 924(a)(2). Sanders appealed the

district court's[1] denial of his motion to suppress. This court affirmed. Sanders petitioned for certiorari, and the Supreme Court vacated the judgment and remanded for further consideration in light of Caniglia v. Strom, 593 U.S. ___, 141 S.Ct. 1596 (2021). See Sanders, 593 U.S. at ___, 141 S.Ct. at 1646. Sanders contends law enforcement officers made a warrantless entry into a house in violation of the Fourth Amendment. For the following reasons, this court once again affirms the district court. We vacate our prior opinion and substitute this opinion in its place.

## I.    BACKGROUND

On February 16, 2018, just before 10:00 a.m., N.R. contacted her grandmother and said that her mother, Karina LaFrancois, and her mother's boyfriend, "Kenny" Sanders, were "fighting really bad" and that "they need[ed] someone to come." N.R. was eleven years old at the time. N.R.'s grandmother called 911 and relayed to the operator that she had been told an altercation was occurring at LaFrancois' house. N.R.'s grandmother also told the 911 operator that she had trouble understanding N.R. and that she did not know if any weapons were involved or whether the fight was verbal or physical. Additionally, N.R.'s grandmother informed the operator that two additional minor children were inside the residence, ages seven and one.

The Dubuque Police Department dispatched officers to the LaFrancois residence on a report of a domestic disturbance. Officer Joel Cross arrived first on scene with Officer Tom Pregler close behind. Additional officers subsequently arrived as well. When Officer Cross arrived at the residence, he saw N.R. "acting excited" and gesturing through an upstairs window. After reporting his observations to Officer Pregler, the two officers knocked on the front door. LaFrancois came

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, adopting the Report and Recommendation from the Honorable C.J. Williams, then Chief United States Magistrate Judge for the Northern District of Iowa.

outside to talk to the officers. LaFrancois was visibly upset and unstable. The officers observed red marks on LaFrancois' face and neck. Despite her obvious emotional state and the visible injuries, LaFrancois told the officers that everything was okay. Officer Cross told LaFrancois that he understood that N.R. had heard the disturbance and contacted law enforcement. LaFrancois became concerned and responded, "Do not tell him that she called you guys."

Officer Pregler told LaFrancois that the officers needed to talk to Sanders. LaFrancois made clear that she did not want the officers to go inside the house. She offered to have Sanders speak with the officers outside. The officers initially assented to allowing LaFrancois to go inside and get Sanders. However, when LaFrancois opened the door to the residence, the officers heard crying inside. After hearing the crying, the officers decided to enter the house to make sure that everyone was safe. They opened the door and saw Sanders and LaFrancois standing just inside the door and a crying infant located in a nearby playpen.

As soon as the officers entered the home, Sanders became noncompliant, uncooperative, and argumentative with the officers. When Officer Cross began to go upstairs to check on N.R. and N.R.'s brother, who was also upstairs, Sanders attempted to block him from going upstairs. The officers directed Sanders to sit on the couch. Officer Cross found N.R. distressed and crying. She told Officer Cross that Sanders "had a gun out," that it "was downstairs," and that she thought it was located in one of the drawers below the "big mirror." Officer Cross went back downstairs and looked through the drawers where N.R. indicated the gun might be. When he did not find a gun, Officer Cross returned upstairs to talk to N.R. again. N.R. admitted that she did not see Sanders with a gun, but during the fight with Sanders, she had heard her mother yelling, "Put the gun down! Put the gun down!" N.R. said that it sounded like LaFrancois was being choked during the fight.

During these events, LaFrancois and Sanders had been separated, with LaFrancois outside and Sanders on the couch. Officer Cross then went outside to speak to LaFrancois. LaFrancois had been texting Sanders, informing him that she was telling the officers that nothing happened. Officer Cross pointedly asked LaFrancois where the gun was located. LaFrancois initially denied there was a gun but quickly expressed concern that Sanders would find out that she had been talking to the officers. LaFrancois asked if she could be arrested instead of Sanders. After further questioning, LaFrancois admitted that she believed Sanders had a gun while the couple were arguing and that it could be in the couch. Officer Cross went back inside the residence, asked Sanders to get off the couch where he had been directed to sit, and discovered a Smith & Wesson .380 caliber pistol in the couch cushions.

Sanders was arrested on state domestic assault charges and a no-contact order was issued. That order was later modified to allow phone and written contact with LaFrancois. When an officer went to execute the federal warrant on May 30, 2018, for the instant offense, he found Sanders and LaFrancois together. Sanders was arrested for violating the no-contact order. On May 31, 2018, the order was modified again to prohibit all contact. Despite the no-contact order, Sanders called LaFrancois from the jail numerous times. He has asserted that he did not know the no-contact order had been modified to once again prohibit all contact with LaFrancois. During one recorded call, Sanders told LaFrancois that her statements from the domestic "need to go away." Sanders arranged for LaFrancois to get a new phone and he called her on a new telephone number 71 times over a six-day period.

Sanders conditionally pled guilty to possession of a firearm by a prohibited person, reserving the right to appeal the denial of his suppression motion. At sentencing, the court found that Sanders' advisory Guidelines range was 77–96 months. The court varied upward from the Guidelines range based on Sanders' violent criminal history and risk to the public, and sentenced him to the statutory maximum term of 120 months' imprisonment. Sanders appeals.

## II. DISCUSSION

### A. *Suppression Motion*

A mixed standard of review applies to the denial of a motion to suppress evidence. We review the factual determinations underlying the district court's decision for clear error and the district court's denial of the suppression motion *de novo*. United States v. Harris, 747 F.3d 1013, 1016 (8th Cir. 2014).

At the "very core" of the Fourth Amendment "stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). The Fourth Amendment's warrant requirement, however, is subject to certain exceptions. In Caniglia, 593 U.S. at ___, 141 S.Ct. at 1598, the Supreme Court held that there is no standalone community caretaker doctrine that justifies warrantless searches and seizures in the home. Notwithstanding this conclusion, the Caniglia Court did not abrogate the Supreme Court's longstanding precedents that allow a warrantless entry into a home under some circumstances. See Sanders, 593 U.S. at ___, 141 S.Ct. at 1647–48 (Kavanaugh, J., concurring).

Because the ultimate touchstone of the Fourth Amendment is reasonableness, the Supreme Court has recognized certain exceptions to the warrant requirement. Luer v. Clinton, 987 F.3d 1160, 1165 (8th Cir. 2021) (per curiam). For example, in Brigham City v. Stuart, 547 U.S. 398 (2006), the Supreme Court recognized that an officer may enter a home without a warrant if he has an objectively reasonable basis to believe that entry is necessary "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Id. at 403. That exigency exception to the warrant requirement applies here.

When examining whether the officers had a reasonable basis to enter LaFrancois' home[2] without a warrant, we look to the facts known to the officers at the time they made the decision to enter. See Burke v. Sullivan, 677 F.3d 367, 371 (8th Cir. 2012) (quoting Ryburn v. Huff, 565 U.S. 469, 474 (2012)). The specific, articulable facts known to the officers when they decided to enter the residence included (1) the information received from dispatch, (2) their own observations, and (3) additional information learned at the scene from talking to LaFrancois.

The officers were dispatched to the scene of a domestic disturbance. The first responding officer observed a child in an upstairs window acting excitedly and gesturing at him. LaFrancois exited the residence and closed the door behind her to speak to the officers. Although LaFrancois said everything was okay, the officers observed LaFrancois had visible injuries in the form of red marks on her face and neck and she was acting emotionally and unstable. LaFrancois directed the officers to not tell Sanders that her daughter had called for help. LaFrancois was so adamant about keeping the officers outside and away from any other witnesses or evidence that might be inside the house that she volunteered to get Sanders and bring him outside. When the officers heard crying coming from inside the house, they decided to enter to provide emergency assistance to anyone who might have been injured and to protect the children, who they knew were inside, from imminent injury.

Under these circumstances, we are satisfied that the officers had an objectively reasonable basis to enter LaFrancois' house without a warrant. Although the presence of a domestic violence suspect in a home with children cannot alone justify a warrantless entry, here the officers were confronted with "facts indicating that the

---

[2]For purposes of this opinion, we will assume, without deciding, that Sanders has standing to challenge the search of the residence and decline to resolve the government's standing argument. See United States v. Long, 906 F.3d 720, 724 (8th Cir. 2018) (assuming, without deciding, the defendant has standing to challenge the search of a rental vehicle).

suspect was a threat to the child[ren] or others." Smith v. Kansas City Police Dep't, 586 F.3d 576, 580 (8th Cir. 2009); see also United States v. Quarterman, 877 F.3d 794, 798–99 (8th Cir. 2017) (finding a reasonable basis to believe a threat existed from a domestic violence suspect). Once at the scene of the domestic disturbance, the officers learned further details indicating a serious concern for the safety of LaFrancois and the children who were inside the house. LaFrancois had visible injuries consistent with a physical altercation. LaFrancois expressed concern for her daughter and directed the officers not to tell Sanders that her daughter was the one that reported the disturbance. A child was seen in an upstairs window acting excitedly and gesturing at the first responding officer.

The record establishes that the officers had reason to believe that a domestic violence suspect was inside the home with children. When LaFrancois opened the door, the suspect was still in the residence and officers heard crying coming from inside. Considering the totality of the facts known to the officers prior to their entry of the home, the officers reasonably believed that entry was necessary to either provide emergency assistance to the child who was heard crying or to prevent an imminent assault on the daughter who had reported the incident.

We further conclude that the scope of the encounter was carefully tailored to satisfy the officers' purpose for entry. Once they entered, the officers separated Sanders and LaFrancois, with LaFrancois stepping outside. Officer Cross located N.R., who told him that during the altercation she could hear her mother yelling, "Put the gun down! Put the gun down!" A warrant is not needed to search areas that may conceal a threat if officers have an objectively reasonable basis to believe an immediate act is required to preserve the safety of others or themselves. Quarterman, 877 F.3d at 800.

Here, Officer Cross had an objectively reasonable belief that a gun was inside the house. The search was conducted out of the officers' legitimate concern for safety

and was limited to two places in the house: (1) where N.R. thought the gun might have been placed, and (2) where LaFrancois believed the gun could be located. Officer Cross found the gun in the second place. Exigent circumstances justified the officers' efforts to locate and secure the gun. United States v. Henderson, 553 F.3d 1163, 1165 (8th Cir. 2009) (per curiam) ("[B]ecause domestic disturbances are highly volatile and involve large risks and because the police officers had reason to believe that a loaded gun was in the bedroom, we think it plain that exigent circumstances justified their effort to secure the weapon.").

### B.    Obstruction of Justice

Sanders argues the district court erred in applying a two-level enhancement for obstruction of justice, which led to the denial of acceptance of responsibility. We review a district court's factual findings underlying an obstruction of justice enhancement and acceptance of responsibility reduction for clear error. United States v. Jones, 612 F.3d 1040, 1046 (8th Cir. 2010). We review the court's construction and application of the Guidelines *de novo*. United States v. Belfrey, 928 F.3d 746, 750 (8th Cir. 2019). We give "great deference" to a district court when it applies an enhancement for obstruction of justice or denies a reduction for acceptance of responsibility. United States v. Calderon-Avila, 322 F.3d 505, 507 (8th Cir. 2003) (per curiam).

At sentencing, Sanders argued that his comment to LaFrancois that her statements from the domestic "need to go away" was neither an attempt to influence her testimony nor related to the instant offense of conviction. He contends on appeal that the comment was "a minuscule portion of a nearly ten-minute conversation" and was "far too ambiguous to warrant" an obstruction of justice enhancement under U.S.S.G. § 3C1.1.

The district court found that Sanders intended to influence a witness or attempted to do so when he told LaFrancois that her statements from the domestic "need to go away." The district court has "broad discretion to apply section 3C1.1 to a wide range of conduct." United States v. Jensen, 834 F.3d 895, 900 (8th Cir. 2016) (quoting United States v. Collins, 754 F.3d 626, 629 (8th Cir. 2014)). "[T]hreatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . directly or indirectly, or attempting to do so" is an example of conduct covered under § 3C1.1. U.S.S.G. § 3C1.1, cmt. n. 4(A).

Having reviewed the record, we conclude the district court did not clearly err in its factual finding that Sanders' statement was, at a minimum, an attempt to influence a witness. Section 3C1.1 applies to conduct involving "cases closely related to the defendant's case." Jensen, 834 F.3d at 900. The firearm in question was alleged to have been used during a domestic assault, which was the event that brought law enforcement officers to the residence. We affirm the district court's decision to increase Sanders' offense level pursuant to U.S.S.G. § 3C1.1.

An obstruction of justice enhancement under § 3C1.1 "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct" as required for a § 3E1.1 reduction. U.S.S.G. § 3E1.1 cmt. n. 4; see United States v. Brown, 539 F.3d 835, 841 (8th Cir. 2008). Although there are "extraordinary cases" in which adjustments under both §§ 3C1.1 and 3E1.1 may apply, United States v. Adejumo, 772 F.3d 513, 537 (8th Cir. 2014), we do not find this particular case to be extraordinary. See United States v. Honken, 184 F.3d 961, 970 (8th Cir. 1999) (noting that an obstructive defendant must "do more than merely cease obstructive conduct and plead guilty to the underlying offense to earn a downward adjustment for acceptance of responsibility"). The district court did not err in refusing to reduce Sanders' applicable Guidelines range to account for acceptance of responsibility.

## III.   CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____